99 F.3d 1504
 1996-2 Trade Cases P 71,608, RICO Bus.Disp.Guide 9154,
20 Employee Benefits Cas. 2065,
96 Cal. Daily Op. Serv. 8063,
96 Daily Journal D.A.R. 13,379
 Mary FORSYTH; Marrietta Cade; Willie Andrews; Mary Lou
Buehler; Helen Staves; Randolph Bratten; and
Searle Auto Glass, Inc., d/b/a Best
Glass Company, Plaintiffs-Appellants,
v.
HUMANA, INC., a Delaware corporation; Humana Health
Insurance of Nevada, Inc., a Nevada corporation;
and Does I through X, inclusive,
Defendants-Appellees.
 No. 94-16548.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 4, 1995.
Decided Nov. 5, 1996.
 
 W.B. Markovits, Markovits & Greiwe, Cincinnati, OH, Will Kemp and J. Randall Jones, Harrison, Kemp & Jones, Las Vegas, NV, for plaintiffs-appellants.
 David N. Frederick, Las Vegas, NV, and Robert N. Eccles, O'Melveny & Myers, Washington, DC, for defendants-appellees.
 G. Robert Blakey, Notre Dame Law School, Notre Dame, IN, argued for appellant.
 Appeal from the United States District Court for the District of Nevada, Philip M. Pro, District Judge, Presiding. D.C. No. CV-89-00249-PMP.
 Before: WALLACE and THOMPSON, Circuit Judges, and THOMPSON, District Judge.*
 Opinion by Judge D. THOMPSON; Partial concurrence and Partial dissent by Judge WALLACE.
 DAVID R. THOMPSON, Circuit Judge:
 
 
 1
 There are two groups of plaintiffs in this case: (1) the employer purchasers of group health insurance policies issued by Humana Health Insurance of Nevada (Premium Payors); and (2) the employee beneficiaries of those policies who made coinsurance payments for health care received (Co-Payors).
 
 
 2
 The Co-Payors received hospital care from Humana Hospital-Sunrise (Sunrise Hospital), an acute care facility which is owned and operated by defendant Humana, Inc. Under its insurance agreements with the Co-Payors, Humana Health Insurance of Nevada (Humana Insurance) was obligated to pay 80% of the employees' hospital charges over and above a designated deductible amount; the Co-Payors were to pay the remaining 20%. Unknown to the plaintiffs, Humana Insurance negotiated a discount with Sunrise Hospital. Because of this discount, Humana Insurance ultimately paid significantly less than its 80% share of Sunrise Hospital's charges and the Co-Payors paid significantly more than their 20% co-payment share.
 
 
 3
 The Co-Payors contend Humana Insurance breached its contract with them, and violated the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, et seq., by failing to pass along to them the Sunrise Hospital discounts in the form of reduced co-payments. The Co-Payors also contend the defendants violated ERISA by breaching fiduciary duties, engaging in prohibited transactions, and retaining excessive compensation. Both groups of plaintiffs contend that the defendants violated section 2 of the Sherman Act, 15 U.S.C. § 2, and engaged in a scheme to defraud in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968.
 
 
 4
 The district court granted summary judgment in favor of the defendants, rejecting all of the plaintiffs' claims except the Co-Payors' ERISA benefits breach of contract claim. This appeal followed.
 
 
 5
 We have jurisdiction under 28 U.S.C. § 1291. We affirm the district court's summary judgment on the ERISA claims, reverse the district court's summary judgment on the Sherman Act antitrust claims, and affirm in part and reverse in part summary judgment on the RICO claims.
 
 
 6
 * FACTS
 
 
 7
 The plaintiffs contracted for health insurance, through employee benefit plans, with Humana Insurance during the period of 1985 through 1988. Pursuant to an agreement made in 1984 between Humana Insurance and Sunrise Hospital, Humana Insurance would receive a discount for its portion of the hospital charges incurred by its insureds. Unaware of this discount, the plaintiffs continued to pay their required premiums and undiscounted co-payments. As a result, Humana Insurance ended up paying less than 80% of the hospital's charges for health care services, the Co-Payors paid more than 20% of these charges, and the Premium Payors paid the same premiums despite the reduced cost to Humana Insurance of the health care services.
 
 
 8
 The plaintiffs assert that Humana Insurance concealed the discount deal by writing checks to Sunrise Hospital for 80% of the billed charges. Sunrise Hospital would then remit the clandestine discount to Humana Insurance through monthly intercompany transfers, in what the plaintiffs characterize as a "classic kickback scheme."
 
 II
 PROCEDURAL HISTORY
 
 9
 The plaintiffs filed this action in the district court on March 29, 1989, alleging both state and federal claims. Six months later, the court granted the defendants' motion, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the state law claims because those claims were preempted by ERISA.
 
 
 10
 The plaintiffs filed a first amended complaint on October 27, 1989. Following another round of motions, the district court upheld the sufficiency of the plaintiffs' ERISA claims, some of the RICO claims and the antitrust claims, and certified the two classes of plaintiffs, Premium Payors and Co-Payors. At the district court's direction, the plaintiffs filed a second amended complaint.
 
 
 11
 The second amended complaint asserted three claims for relief: (1) an ERISA claim by the Co-Payor class against Humana Insurance alleging breach of fiduciary duty, prohibited transactions and retention of excessive compensation; (2) an antitrust claim under section 2 of the Sherman Act by both classes of plaintiffs alleging the defendants had monopolized or attempted to monopolize the market for acute care facilities in Clark County, Nevada; and (3) a RICO claim by both classes of plaintiffs alleging Humana Insurance marketed and administered its policies through repeated acts of mail and wire fraud.
 
 
 12
 Again, the defendants moved for summary judgment. On July 21, 1993, after exhaustive briefing and argument, the district court granted the motion in its entirety ("the July 21, 1993 judgment"), but gave the plaintiffs leave to file a third amended complaint to assert on behalf of the Co-Payor class an ERISA benefits breach of contract claim against Humana Insurance under 29 U.S.C. § 1132(a)(1)(B).
 
 
 13
 The plaintiffs filed a third amended complaint. In that complaint they asserted only one claim, a breach of contract claim under ERISA in which they alleged that the Co-Payor class was entitled to benefits under 29 U.S.C. § 1132(a)(1)(B), because Humana Insurance had not properly allocated the discount it received from Sunrise Hospital.
 
 
 14
 The Co-Payor class moved for summary judgment on this claim; Humana Insurance also moved for summary judgment as to the proper measure of damages. The district court granted both motions on June 3, 1994 (the "June 3, 1994 judgment"), finding liability on the breach of contract claim, but limiting damages to the excess charges the Co-Payor plaintiffs paid, and specifying the methodology for calculating the damages for these class members. Following further submissions by the parties, the district court entered an order on July 29, 1994 approving and adopting a schedule of damage awards by which the Co-Payors were to be reimbursed the amounts they had been overcharged on their co-payments.
 
 
 15
 On July 1, 1994, before the district court determined the damage awards, the plaintiffs filed a notice of appeal from the district court's June 3, 1994 judgment. The plaintiffs voluntarily dismissed that appeal after we determined that the June 3, 1994 judgment was not a final, appealable order. Thereafter, the plaintiffs filed a timely notice of appeal which brings this case before us.
 
 
 16
 The defendants have moved to dismiss this appeal in its entirety, or in the alternative to limit the appeal to the sole claim asserted in the plaintiffs' third amended complaint. In the defendants' words, their motion to dismiss raises two jurisdictional issues: "(1) whether plaintiffs' voluntary dismissal of an earlier appeal from the June 3[, 1994] Judgment precludes review of that judgment here; and (2) whether plaintiffs' failure to preserve in their Third Amended Complaint claims dismissed by the district court's earlier Order of July 21, 1993, precludes review of that ruling in this appeal."
 
 
 17
 On the merits, the defendants dispute the plaintiffs' various claims of error, and ask us to affirm the district court across the board. We first consider the motion to dismiss or limit the appeal.
 
 III
 MOTION TO DISMISS OR LIMIT APPEAL
 
 18
 The plaintiffs' voluntary dismissal of their premature appeal from the June 3, 1994 judgment does not preclude review of that judgment in this appeal. The June 3, 1994 judgment was not a final, appealable order when it was entered because the district court had not then determined the amount of damages. See Brown v. United States Postal Serv., 860 F.2d 884, 886 (9th Cir.1988). We deny the motion to dismiss the appeal in its entirety.
 
 
 19
 The defendants' contention that the appeal should be limited to the ERISA benefits breach of contract claim asserted in the third amended complaint presents a more complicated question. The plaintiffs did not reallege in that complaint any of the claims previously dismissed by the district court. The question is whether this omission precludes our review of the district court's dismissal of the previously asserted claims.
 
 
 20
 It is the law of this circuit that a plaintiff waives all claims alleged in a dismissed complaint which are not realleged in an amended complaint. London v. Coopers & Lybrand, 644 F.2d 811, 814 (9th Cir.1981); Sacramento Coca-Cola Bottling Co. v. Chauffeurs, Teamsters and Helpers Local 150, 440 F.2d 1096, 1098 (9th Cir.), cert. denied, 404 U.S. 826, 92 S.Ct. 57, 30 L.Ed.2d 54 (1971); Loux v. Rhay, 375 F.2d 55, 57 (9th Cir.1967). This rule is premised on the notion that the "amended complaint supersedes the original, the latter being treated thereafter as non-existent." Loux, 375 F.2d at 57. If a plaintiff fails to include dismissed claims in an amended complaint, the plaintiff is deemed to have waived any error in the ruling dismissing the prior complaint. London, 644 F.2d at 814; Sacramento Coca-Cola, 440 F.2d at 1098; Loux, 375 F.2d at 57.
 
 
 21
 We have declined, however, to extend the London rule to amended complaints that follow summary judgment. See USS-POSCO Indust. v. Contra Costa County Bldg. & Const. Trades Council, 31 F.3d 800, 812 (9th Cir.1994). The rulings challenged by the plaintiffs in this appeal are rulings on summary judgment. As such, the claims which the court dismissed pursuant to these rulings have not been waived by the plaintiffs' failure to reallege them in the third amended complaint. Id. The defendants' motion to limit the issues in this appeal to the claim asserted in the plaintiffs' third amended complaint is therefore denied. To the extent, however, that the plaintiffs seek review of the district court's earlier dismissal of their state law claims pursuant to Federal Rule of Civil Procedure 12(b)(6), such claims were waived by the failure to reallege them after the Rule 12(b)(6) dismissal. London, 644 F.2d at 814.
 
 IV
 MERITS
 A. Standard of Review
 
 22
 We review a grant of summary judgment de novo. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Id.
 
 B. ERISA
 
 23
 The district court concluded the Co-Payor plaintiff class had no standing to bring their ERISA claim under 29 U.S.C. § 1132(a)(3) for breach of fiduciary duty. The court determined that the remedy provided by ERISA for the Co-Payors' harm was a benefits claim for breach of contract pursuant to section 1132(a)(1)(B) and not a claim for breach of fiduciary duty under section 1132(a)(3).
 
 
 24
 While this appeal was pending the Supreme Court issued its decision in Varity Corp. v. Howe, --- U.S. ----, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). The Court held that an individual beneficiary may bring suit against a plan administrator for a breach of fiduciary duty under 29 U.S.C. § 1132(a)(3). Previous case law in this circuit had allowed such an action only in very limited circumstances not present in this case. See, e.g., Amalgamated Clothing & Textile Workers Union v. Murdock, 861 F.2d 1406 (9th Cir.1988); Waller v. Blue Cross of California, 32 F.3d 1337 (9th Cir.1994). The opinion in Varity Corp. expands what we previously viewed as permissible actions under section 1132(a)(3), but not to the extent necessary to accommodate the Co-Payors' claim in this case.
 
 
 25
 In Varity Corp. the Court emphasized that section 1132(a)(3) is a "catchall" provision which provides relief only for injuries that are not otherwise adequately provided for. --- U.S. at ----, 116 S.Ct. at 1078.
 
 
 26
 Thus, we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be "appropriate."
 
 
 27
 The Supreme Court thus interpreted the statute to allow individual relief for a breach of fiduciary duty in an ERISA action only where no other adequate relief is available.
 
 
 28
 The Court distinguished Massachusetts Mut. Life Ins. v. Russell, 473 U.S. 134, 144, 105 S.Ct. 3085, 3091, 87 L.Ed.2d 96 (1985), which had interpreted section 1132(a)(2) to allow recovery for breach of fiduciary duty only where the relief is sought on behalf of the entire plan. Other than the fact that it had interpreted a different subsection of the statute, one of the factors which distinguished Russell was that another remedy, section 1132(a)(1), already provided specific relief for the sort of injury suffered in that case.
 
 
 29
 In the present case, the Co-Payors seek to recover individual relief under section 1132(a)(3) for Humana Insurance's breach of fiduciary duty. But the Co-Payors have already won a judgment for damages under section 1132(a)(1) for the injuries they suffered as a result of the defendant's actions. The district court determined, and we agree, that the Co-Payors are entitled to recover, in the form of damages pursuant to their claim under section 1132(a)(1), all amounts they were forced to pay over and above their contractual co-payment obligation.
 
 
 30
 In these circumstances, Varity Corp. does not authorize equitable relief under the catchall provision of section 1132(a)(3). Equitable relief under section 1132(a)(3) is not "appropriate" because section 1132(a)(1) provides an adequate remedy in this case.
 
 
 31
 We affirm the district court's summary judgment against the Co-Payors on their breach of fiduciary duty claim under section 1132(a)(3) of ERISA. We also affirm the district court's summary judgment in favor of the Co-Payors on their benefits breach of contract claim under section 1132(a)(1) of ERISA and the district court's computation of damages set forth in its July 29, 1994 order.
 
 C. Antitrust
 
 32
 The plaintiffs sought approximately $181 million in damages against the defendants for monopolization and attempted monopolization under section 2 of the Sherman Act, 15 U.S.C. § 2.[1] The district court concluded the plaintiffs failed to produce evidence in support of this claim sufficient to survive a motion for summary judgment. Specifically, the district court determined the plaintiffs had not provided sufficient evidence in support of their claim of monopolization to establish the relevant submarkets they asserted, the exercise of market power, or antitrust injury.
 
 
 33
 To prevail on a claim of monopolization under section 2 of the Sherman Act, a plaintiff must demonstrate: "(1) [p]ossession of monopoly power in the relevant submarket; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury." Pacific Express, Inc. v. United Airlines, Inc., 959 F.2d 814, 817 (9th Cir.), cert. denied, 506 U.S. 1034, 113 S.Ct. 814, 121 L.Ed.2d 686 (1992).
 
 
 34
 Monopoly power, for the purpose of section 2 of the Sherman Act, is "the power to control prices or exclude competition." United States v. Grinnell Corp., 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966) (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1004-05, 100 L.Ed. 1264 (1956)). A plaintiff may demonstrate market power either by direct evidence or by circumstantial evidence. Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1434 (9th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995). Direct proof of market power may be shown by evidence of restricted output and supracompetitive prices. Id. Such a showing "is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power." Id.
 
 
 35
 The plaintiffs submitted evidence that Sunrise Hospital routinely charged higher prices than other hospitals while reaping high profits. With no accompanying showing of restricted output, however, the plaintiffs have failed to present direct evidence of market power.
 
 
 36
 The more common method of establishing monopoly power is by circumstantial evidence. This requires the plaintiff to: "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run."
 
 
 37
 It is impossible to determine market share without first defining the relevant market. Id. at 1434. Definition of the relevant market cannot be performed with mathematical accuracy; it is simply the recognition of a field in which meaningful competition is said to exist. See United States v. Continental Can Co., 378 U.S. 441, 449, 84 S.Ct. 1738, 1743, 12 L.Ed.2d 953 (1964). We have previously defined the relevant market as the group of sellers or producers who have the "actual or potential ability to deprive each other of significant levels of business." Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc., 875 F.2d 1369, 1374 (9th Cir.1989). "[T]he definition of the relevant market is a factual inquiry for the jury, and the court may not weigh evidence or judge witness credibility." Rebel Oil, 51 F.3d at 1435. See also Thurman Indus., 875 F.2d at 1374.
 
 
 38
 The district court held the relevant market was the general acute care hospital market in Clark County, Nevada, which consisted of seven facilities in addition to Sunrise Hospital. The plaintiffs contend the district court arrived at this conclusion by weighing competing evidence. The plaintiffs argue the relevant market is smaller than the market found by the district court. They contend there are two distinct submarkets which the defendants monopolized or attempted to monopolize: (1) the acute care hospitals actually used by Humana insureds; and (2) the major for-profit acute care hospitals in Clark County, Nevada. "A submarket exists if it is sufficiently insulated from the larger market so that supply and demand are inelastic with the larger market." Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd., 924 F.2d 1484, 1490 (9th Cir.1991).
 
 
 39
 In support of their first contention that the relevant submarket is the acute care hospitals actually used by Humana insureds, the plaintiffs submitted an affidavit indicating that 75% to 85% of Humana insureds used Sunrise Hospital, and that this high proportion was achieved through contractual disincentives such as higher deductibles and co-payments for other hospitals, and noncontractual disincentives such as delaying or denying payment to other hospitals which made it difficult for Co-Payors to use them.
 
 
 40
 We reject the plaintiffs' attempt to limit the relevant market to acute care hospitals used by Humana insureds. The plaintiffs used Sunrise Hospital and obtained medical care from few other hospitals because of contractual provisions in their insurance policies. This tie-in defeats the plaintiffs' argument for a submarket consisting only of those hospitals Humana insureds actually used. See Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 490-91, 112 S.Ct. 2072, 2094-95, 119 L.Ed.2d 265 (Scalia, J., dissenting) (1992). To succeed in the face of the contractual tie-in created by the insurance policies, the plaintiffs would have to make a showing of monopoly power in the health insurance market, and there is no evidence of this. See id.; Jefferson Parish Hosp. Dist. 2 v. Hyde, 466 U.S. 2, 13-14, 104 S.Ct. 1551, 1558-59, 80 L.Ed.2d 2 (1984).
 
 
 41
 The plaintiffs' second asserted relevant submarket consists of the major for-profit acute care hospitals in Clark County, Nevada. This submarket allegedly includes Sunrise Hospital, Valley Hospital, and Desert Springs Hospital. Excluded from this market are Clark County's five remaining acute care hospitals, Boulder City Hospital (Boulder City), Community Hospital of North Las Vegas (Community), St. Rose De Lima Hospital (St. Rose), University Medical Center (UMC), and Women's Hospital (Women's). The plaintiffs submitted evidence tending to support their contention that the five remaining acute-care hospitals in Clark County, which the district court included in its determination of the relevant market, were not competitors of Sunrise Hospital. For example, there was evidence that UMC charged patients 15 to 20 percent less than Sunrise Hospital. Yet, because UMC was considered a hospital for the indigent, patients with a choice, such as those with insurance, eschewed UMC in favor of the larger for-profit hospitals despite the significantly lower price at UMC.
 
 
 42
 We recognize "the scope of the relevant market is not governed by the presence of a price differential." Twin City Sportserv., Inc. v. Charles O. Finley & Co., 512 F.2d 1264, 1274 (9th Cir.1975). But when demand for the commodity of one producer shows no relation to the price for the commodity of another producer, it supports the claim that the two commodities are not in the same relevant market.
 
 
 43
 There was also evidence that Boulder City, St. Rose, Community, and Women's were considered "niche" hospitals that did not offer the range of services available at Sunrise Hospital. This, alone, is not enough. Specialty shops which offer only a limited range of goods are generally considered in the same market with larger, more diverse, "one-stop shopping" centers. Thurman Indust., 875 F.2d at 1374-77. However, the plaintiffs also submitted documentary evidence, including an expert's affidavit and testimony before the Nevada legislature, which tended to support their contention that these specialty hospitals did not, in fact, compete with Sunrise Hospital.
 
 
 44
 We have not recounted the evidence submitted by the defendants, but it was substantial. Were we to weigh the evidence we might be inclined to find that the plaintiffs failed to establish their alleged submarket. On a motion for summary judgment, however, this would be inappropriate.
 
 
 45
 We conclude the evidence the plaintiffs presented was sufficient to withstand the defendants' motion for summary judgment as to the plaintiffs' second asserted relevant market.
 
 
 46
 The additional issues of monopoly power and the maintenance of monopoly power depend upon a resolution of the relevant market question. Rebel Oil, 51 F.3d at 1434. Whether the defendants engaged in anticompetitive behavior is dependent upon resolution of these issues. See Pacific Express, 959 F.2d at 818.
 
 
 47
 The same may be said of the plaintiffs' section 2 claim for attempted monopolization. To prevail on such a claim, a plaintiff must demonstrate four elements: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed toward accomplishing that purpose; (3) a dangerous probability of success; and (4) causal antitrust injury. Rebel Oil, 51 F.3d at 1433.
 
 
 48
 The plaintiffs' claim of attempted monopolization was not directly addressed by the district court. Resolution of this issue, like the claim of actual monopolization, is dependent upon a definition of the relevant market. Without such a determination, we cannot assess whether challenged activity was anticompetitive. In sum, the determination of all these subsidiary issues depends on the determination of the question of the relevant market; and there is a genuine dispute of material fact as to that.
 
 
 49
 We reverse the district court's summary judgment in favor of the defendants on the plaintiffs' antitrust claim.
 
 D. RICO
 
 50
 Both the Premium Payor and the Co-Payor classes alleged that during the period from 1985 through 1988, in violation of the civil RICO statute, 18 U.S.C. § 1964(C): (1)[2] Humana, Inc. and Humana Insurance acted as members of an "association in fact" enterprise, or alternatively, that Humana, Inc., a person within the meaning of 18 U.S.C. § 1961(3), associated with Humana Insurance, an enterprise within the meaning of 18 U.S.C. § 1961(4); (2) Humana, Inc. and Humana Insurance entered into a secret agreement to give Humana Insurance an excessive discount for hospital charges incurred by its insureds; (3) Humana, Inc. and Humana Insurance concealed and misrepresented this agreement in numerous mailings, television and radio commercials, and telephone calls; and (4) such acts were intended to defraud the Premium Payor class into purchasing policies and the Co-Payor class into paying excessive co-payments.
 
 
 51
 The district court granted the defendants' motion for summary judgment because it found the plaintiffs' RICO claims were barred by the McCarran-Ferguson Act. Additionally, the district court determined that the Premium Payors' RICO claim failed because the Premium Payors failed to demonstrate a direct relationship between the alleged injurious conduct and the injury asserted (excessive premiums), or any " 'concrete financial injury,' for the purposes of RICO." The district court also held the defendants were "entitled to summary judgment on the Co-Payor class's RICO claim to the extent that the Co-Payor class [sought] damages in excess of the amount that could have been recovered under a proper interpretation of the co-payment provision."
 
 1. The McCarran-Ferguson Act
 
 52
 The MFA, 15 U.S.C. § 1011, et seq., was enacted, in part, to allow states to regulate the business of insurance free from inadvertent preemption by federal statutes of general applicability. Merchants Home Delivery Serv., Inc. v. Frank B. Hall & Co., 50 F.3d 1486, 1488-89 (9th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 418, 133 L.Ed.2d 335 (1995). Section 2(b) of the MFA provides in pertinent part:
 
 
 53
 No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance.
 
 
 54
 We have adopted a four-part test to determine when section 2(b) of the MFA precludes the application of a federal statute to preempt state insurance law. Merchants Home, 50 F.3d at 1489. The MFA precludes such preemption by a federal statute if: "(1) the statute does not 'specifically relate' to the business of insurance, (2) the acts challenged under the statute constitute the business of insurance, (3) the state has enacted a law or laws regulating the challenged acts, and (4) the state law would be superseded, impaired or invalidated by the application of the federal statute." Id. All four factors must be satisfied. Id. Only the first factor is not disputed in this case--the parties concede RICO does not specifically relate to the business of insurance.
 
 
 55
 With regard to the second factor, the crux of the plaintiffs' claim is that Humana Insurance misrepresented how premiums would be calculated, leading the Premium Payors to believe a discount from Sunrise Hospital would lower their premium rates, and that the defendants overcharged the Co-Payors by billing them for 20% of the undiscounted cost of their hospital care.
 
 
 56
 The plaintiffs argue these allegedly fraudulent acts cannot be part of the business of insurance because "[f]raud is not a legitimate aspect of risk management." In Merchants Home we rejected such an argument and we do so again. It is useless "to point to a practice forbidden by federal law ... and observe that this practice is not itself insurance." Id. at 1490 (quoting NAACP v. American Family Mut. Ins. Co., 978 F.2d 287, 294 (7th Cir.1992), cert. denied, 508 U.S. 907, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993)). Such an interpretation would "read the McCarran-Ferguson Act out of existence" because "[a]ny practice which violated any federal statute would, by definition, not be the 'business of insurance,' resulting in all federal statutes applying to the business of insurance with their 'full rigor.' " Id.
 
 
 57
 The acts the plaintiffs challenge are analytically equivalent to the overcharging for premiums alleged in Merchants Home. There, the plaintiff asserted RICO claims for fraudulent insurance practices by the defendant. Id. at 1488. The plaintiff alleged three types of fraudulent practices: (1) overcharging for premiums on actual policies; (2) collecting premiums on fictitious policies; and (3) collecting money from the insured to pay uninsured claims which the insurer did not actually pay. Id. We held overcharging for premiums was part of the "business of insurance," though collection of premiums on nonexistent policies and collecting money from the insured for bogus uninsured claims were not part of such business. Id. at 1490.
 
 
 58
 Consistent with Merchants Home, we conclude the challenged practices in this case of Humana Insurance overcharging premiums and not reducing co-payments is the "business of insurance" for the purpose of the MFA.
 
 
 59
 The third factor in the preemption analysis is whether the state has enacted a law or laws regulating the challenged acts. We agree with the district court that the Nevada Act was enacted to regulate the acts challenged by the plaintiffs.
 
 
 60
 In 1971, Nevada adopted the Trade Practices and Frauds; Financing of Premiums Act (Act), N.R.S. § 686A.010, et seq. The purpose of the Act was:
 
 
 61
 to regulate trade practices in the business of insurance in accordance with the intent of Congress as expressed in the [MFA], 15 U.S.C. §§ 1011 to 1015 inclusive, by defining, or providing for the determination of, all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined.
 
 
 62
 N.R.S. § 686A.010.
 
 
 63
 Under the Act, the Nevada Commissioner of Insurance is granted "exclusive jurisdiction" to regulate the trade practices of the business of insurance. N.R.S. § 686A.015. The Act specifically prohibits the dissemination of false or misleading information relating to the sale of policies or benefits. N.R.S. §§ 686A.030 & 686A.040. The plaintiffs' observation that the Act provides for only administrative remedies does not alter our finding that it regulates the challenged acts. The third factor is satisfied.
 
 
 64
 Applying the fourth factor, we consider whether the application of RICO would invalidate, impair, or otherwise supersede Nevada's legislation. In Merchants Home, we addressed, for the first time, the question whether a federal statute invalidated, impaired, or superseded a state law under section 2(b) of the MFA. Merchants Home, 50 F.3d at 1492. As in the present case, the state law in Merchants Home provided for only administrative remedies, but the federal law (RICO) provided for a private right of action. Id. We held the application of the federal statute, although it "prohibited" acts which were also prohibited under the state's insurance law, did "not 'invalidate, impair, or supersede' the state's laws under § 2(b) of the McCarran-Ferguson Act." Id.
 
 
 65
 Here, as in Merchants Home, there is some symmetry between RICO's private right of action and Nevada's administrative scheme. RICO permits an injured plaintiff to recover for fraudulent practices which the Nevada administrative scheme proscribes. This symmetry, however, does not create a conflict between federal and state law. Id. Accordingly, the fourth factor is not present. The MFA does not preclude the plaintiffs' RICO claims.[3]
 
 
 66
 The next question we consider is whether the plaintiffs produced enough evidence in support of their RICO claims to survive summary judgment.
 
 2. Premium Payors' Claim
 
 67
 To state a claim under RICO, 18 U.S.C. § 1962(c), a plaintiff must demonstrate: (1) the conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity.[4] Sun Sav. and Loan Ass'n v. Dierdorff, 825 F.2d 187, 191 (9th Cir.1987). Racketeering activity is any act indictable under various provisions of 18 U.S.C. § 1961 and includes the predicate acts alleged in this case of mail fraud and wire fraud under 18 U.S.C. §§ 1341 and 1343. Id. Mail fraud under section 1341 requires the showing of a scheme to defraud involving use of the United States mails with the specific intent to defraud. Schreiber Distributing Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1399-1400 (9th Cir.1986). Wire fraud under section 1343 requires the same showing, but involves use of United States wires. Id. at 1400.
 
 
 68
 The district court held the Premium Payor class failed to demonstrate the requisite causal connection between the alleged predicate acts and the asserted damages. The court also held the class failed to demonstrate "concrete financial injury."
 
 
 69
 To maintain a claim under RICO, a plaintiff must show not only that the defendant's violation was a "but for" cause of his injury, but that it was the proximate cause as well. Imagineering, Inc. v. Kiewit Pacific Co., 976 F.2d 1303, 1311 (9th Cir.1992), cert. denied, 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993). This requires a showing of a direct relationship between the injurious conduct alleged and the injury asserted. Id. The plaintiff must show a concrete financial loss. Id.
 
 
 70
 In the present case, the Premium Payor class had to establish that they relied on misrepresentations in buying their insurance policies, and that these misrepresentations directly caused them a concrete financial loss. They contend their claim is simple. Humana, Inc. and Humana Insurance represented to them, through mailings, television and radio commercials, and phone calls, that cost savings would be passed along to them in the form of reduced premiums. They relied on these representations in choosing Humana Insurance as their insurance carrier. The hospital discount Humana Insurance received from Sunrise Hospital was a form of cost saving, yet it was not incorporated into calculation of their premiums. Because their premiums did not reflect these discounts, the Premium Payors contend they suffered a financial loss.
 
 
 71
 The district court found no evidence in the record to support the Premium Payors' contention that the defendants fraudulently represented how premiums would be calculated. The class argues the myriad advertisements and promotions did just that. We disagree. The transcript of commercials submitted by the class fails to support their argument. The commercials simply state that because Humana Insurance can "control costs" the employers and employees can save money. The district court accurately described such statements as "puffery." The statements were too general to be interpreted as defining any calculation of insurance premiums.
 
 
 72
 The class also submitted Humana Insurance's annual reports. Statements in the reports suggested patients were encouraged to attend Humana hospitals "where savings could be shared with employers and their employees through lower premiums." Like the advertisements, this statement did not make a specific representation as to how the premiums would be calculated sufficient to support a cause of action for fraud.
 
 
 73
 Because we conclude the Premium Payor class failed to come forward with any evidence that the defendants misrepresented how the insurance premiums would be calculated, we do not reach the question of causation. The district court did not err in granting summary judgment against the Premium Payors on their RICO claim.
 
 3. Co-Payors' Claim
 
 74
 The Co-Payors alleged the failure to disclose the Sunrise Hospital discount in the notice of coinsurance obligations sent to them induced them to make inflated co-payments. The Co-Payors were thus allegedly injured by the defendants' fraudulent failure to reduce their co-payment bills in accordance with the agreed ratio of 80% to 20%.
 
 
 75
 Although these facts presented at least a triable issue of fact on the Co-Payors' RICO claim, the district court dismissed the claim as barred by the McCarran-Ferguson Act. As we have previously stated, the McCarran-Ferguson Act does not preclude a RICO claim in this case. We therefore reverse the district court's summary judgment in favor of the defendants on the Co-Payors' RICO claim. We note, however, that with regard to damages, the district court did not err in concluding that the Co-Payors failed to present any evidence of financial harm resulting from the misrepresentations, except for the amounts they overpaid as a result of the nondisclosure of the discount.
 
 E. Motion To Amend
 
 76
 The plaintiffs contend the district court erred in not granting them leave to amend their complaint. The plaintiffs sought leave to add three additional claims: (1) a RICO conspiracy claim; (2) a claim for obstruction of justice under 18 U.S.C. § 1503; and (3) their previously dismissed state law claims.
 
 
 77
 We review for abuse of discretion a district court's denial of a motion to amend. DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir.1987).
 
 
 78
 Leave to amend pleadings "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). We apply this rule with "extreme liberality." Morongo Band of Mission Indians v. Rose, 893 F.2d 1074, 1079 (9th Cir.1990). The following factors guide a court's determination of whether a motion to amend should be granted: (1) undue delay; (2) bad faith; (3) futility of amendment; and (4) prejudice to the opposing party. Hurn v. Retirement Fund Trust of Plumbing, Etc., 648 F.2d 1252, 1254 (9th Cir.1981). Of these elements, only the futility issue is relevant in this case.
 
 
 79
 Because the plaintiffs' state law claims are preempted by ERISA, leave to amend to reassert the state law claims would be futile. The obstruction of justice claim under 18 U.S.C. § 1503 is also futile because 18 U.S.C. § 1503 is a criminal statute that does not provide for a private cause of action. Hanna v. Home Ins. Co., 281 F.2d 298, 303 (5th Cir.1960), cert. denied, 365 U.S. 838, 81 S.Ct. 751, 5 L.Ed.2d 747 (1961); Odell v. Humble Oil & Refining Co., 201 F.2d 123, 127 (10th Cir.), cert. denied, 345 U.S. 941, 73 S.Ct. 833, 97 L.Ed. 1367 (1953). With regard to the proffered RICO conspiracy claim, however, in light of our determination that the Co-Payor class's RICO claim is not barred by the MFA, we conclude the Co-Payor class should be allowed to amend its complaint to assert this claim.
 
 V
 CONCLUSION
 
 80
 The district court's grant of summary judgment is affirmed as to the ERISA issues, reversed and remanded as to the Sherman Act antitrust issues, affirmed as to the Premium Payor class's RICO claim, and reversed and remanded as to the Co-Payor class's RICO claim. In addition, we grant the Co-Payor class leave to amend its RICO claim to allege a RICO conspiracy. The plaintiffs shall recover from the defendants one-half of the plaintiffs' costs on appeal.
 
 
 81
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 82
 WALLACE, Circuit Judge, concurring and dissenting:
 
 
 83
 I concur with the majority in large measure, but two parts of the opinion are so troubling that I cannot agree. The first deals with the antitrust claims in part IV.C. Here we differ, although reasonable minds can differ, in this complex economic terrain. I am inclined to the position that the district court did not err in concluding that Forsyth's evidence for a submarket of for-profit hospitals was insufficient to survive summary judgment. The majority's analysis of this issue displays a subtle but important error of market definition theory. The majority also inadvertently mischaracterizes the district court's treatment of the RICO damages issue for the Co-Payor class (part IV.D.3.). I would affirm.
 
 
 84
 Forsyth contends that Humana monopolized or attempted to monopolize a market for major for-profit acute care hospitals in Clark County, Nevada. The district court held that Forsyth failed to establish the existence of a separate market for for-profit hospitals within the general Clark County hospital market. In reversing and holding this is a material fact in dispute, the majority points to two categories of evidence submitted by Forsyth. The first depends on a faulty inference about cross-price elasticity of demand, and the second is insufficient to avoid summary judgment.
 
 
 85
 As evidence for the existence of a separate market, the majority states that although "UMC charged patients 15 to 20 percent less than Sunrise Hospital, ... patients with a choice, such as those with insurance, eschewed UMC in favor of the larger for-profit hospitals despite the significantly lower price at UMC." The majority interprets this consumer behavior as evidence that demand for for-profit hospitals is not responsive to the price charged by non-profit hospitals; "when demand for the commodity of one producer shows no relation to the price for the commodity of another producer, it supports the claim that the two commodities are not in the same relevant market."
 
 
 86
 The majority's test refers to the economic concept of cross-price elasticity of demand, which is a useful tool for evaluating whether products compete in the same market. Cross elasticity of demand measures the percentage change in the quantity which consumers demand of one product in response to a percentage change in the price of another.When the cross-price elasticity of demand for good i with respect to the price of good j is positive, an increase in [the price of] j causes the demand for good i to rise; in that case, the goods are substitutes (as fuel oil and coal). Conversely, if the cross-price elasticity is negative, the goods are complements (as cigars and matches).
 
 
 87
 2A Phillip E. Areeda, et al., Antitrust Law 105 (rev.ed. 1995). A high cross elasticity of demand indicates that products are close substitutes, and should probably be treated as part of the same market. A low or zero cross elasticity of demand is evidence that products do not compete in the same relevant market.
 
 
 88
 By focusing on this relationship between the demand for one commodity and the price of another, the majority attempts to avoid the common but fallacious assumption that expensive products automatically compete in a separate market from inexpensive ones. See Twin City Sportservice v. Charles O. Finley & Co., 512 F.2d 1264, 1274 (9th Cir.1975) ("the scope of the relevant market is not governed by the presence of a price differential"). The majority reasons that if "patients with a choice" prefer Sunrise hospital even though it is more expensive, then demand for Sunrise "shows no relation" to the prices charged at UMC and the other "indigent" hospitals.
 
 
 89
 That inference causes me to depart from the majority. We cannot conclude that demand for Sunrise "shows no relation" to the prices at UMC without some evidence of how demand for Sunrise responds to a change in the prices at UMC. Cross elasticity of demand measures a dynamic relationship between two variables: the quantity demanded of product i, and the price of product j. That is, by economic formulation,
 
 
 90
 Ed subij = - (change in) Qd subi /Qd subi
 
 
 
 (change in) P subj /P subj
 2A Areeda, Antitrust Law at 105. Cross elasticity cannot be calculated or approximated without information about the quantity demanded of i at (at least) two different prices of j. The record does not reflect that Forsyth introduced any such evidence, and without it the majority's inference is inappropriate.
 The following example may help in making my point. Suppose that Ford and Chevrolet each sell a light truck. The Ford has four-wheel drive, and costs $2000 more than the Chevrolet, which does not have four-wheel drive. Both trucks sell equally well. If Chevrolet cuts the price of its truck in half and Ford's sales are unaffected, we might infer that the two vehicles are in different relevant markets. But the majority would interpret the simple fact that some consumers buy the Ford, notwithstanding the price differential, as evidence that the trucks do not compete. That reasoning, it seems to me, is faulty.
 If four-wheel drive is worth about $2000 to most consumers, for example, small changes in the price of the Ford could have a dramatic impact on demand for the Chevrolet. If the availability of the Chevrolet significantly limits the rational pricing strategies for Ford, then the two trucks "compete" in the sense that matters for antitrust market definition. Ford could not exact monopoly profits by raising the price of its truck, because it would lose too many customers to Chevrolet.
 The majority also points to certain documentary evidence, including an expert's affidavit and testimony before the Nevada legislature, which tended to support Forsyth's contention that the "niche" hospitals did not compete with Sunrise. "Niche" sellers are generally considered to be in the same market with larger, more diverse vendors which carry the same products. See Thurman Industries v. Pay 'N Pak Stores, 875 F.2d 1369, 1374-77 (9th Cir.1989). I do not believe that the district judge erred in concluding that Forsyth's evidence on this point was insufficient to create a triable issue of fact.
 Finally, the majority misinterprets the district court's treatment of the RICO damages issue for the Co-Payor class. The district court did not merely "conclude" that the Co-Payors failed to provide evidence of financial harm other than the amounts they overpaid; it granted partial summary judgment against them on any claim for damages in excess of those overpayments. I would affirm this alternate partial summary judgment.
 
 
 *
 The Honorable Gordon Thompson, Jr., United States District Court Judge for the Southern District of California, sitting by designation
 
 
 [1]
 Title 15 U.S.C. § 2 provides:
 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.
 
 
 [2]
 Title 18 U.S.C. § 1964(c) provides:
 Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.
 
 
 [3]
 The district court cannot be faulted for ruling to the contrary. It did not have the benefit of Merchants Home, decided in 1995, when it rendered its summary judgment in this case
 
 
 [4]
 Title 18 U.S.C. § 1962(c) provides:
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.