134 F.3d 377
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
FIDELITY NATIONAL TITLE INSURANCE COMPANY OF CALIFORNIA, a
California Corporation, Plaintiff-Appellee,
v.
NATIONAL WESTMINSTER BANK, U.S.A., a New York banking
corporation, Defendant-Appellant.
 No. 96-16059.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 12, 1997.
Decided Jan. 23, 1998.
 
 Before GOODWIN, and THOMAS, C. J., and D. PREGERSON,**
 
 
 1
 MEMORANDUM*
 
 
 2
 COYLE, District Judge.
 
 
 3
 National Westminster Bank USA ("NatWest") appeals the district court's judgment against it in Fidelity National Title Insurance Company's ("Fidelity") action seeking a declaratory judgment that it owed no duty of coverage or defense under a title insurance policy it issued to NatWest. We affirm the district court's judgment as to all of NatWest's contentions of error.
 
 1. Effective Date of the Indorsement
 
 4
 NatWest contends that the district court erred in applying the exclusion to Daniel's mechanic's lien because, it argues, the exclusion became effective upon receipt of the indorsement by NatWest and the lien claim arose prior to that receipt. The indorsement to which both Fidelity and NatWest agreed, however, included an effective date of September 20, 1989, the date of the modification closing. We agree with the district court that the indorsement was effective as of this date and thus applying it to Daniel's mechanics lien presents no problem of retroactivity.
 
 2. Interpreting the Contract
 
 5
 NatWest argues that the district court erred in interpreting the contract based solely on its written provisions without taking into account the context of the transaction. California law makes clear that the intent of the parties "is to be inferred, if possible, solely from the written provisions of the contract." Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co., 855 P.2d 1263, 1270 (Cal.1993); see also Montrose Chem. Corp. v. Admiral Ins. Co., 913 P.2d 878, 888 (Cal.1995). When "contractual language is clear and explicit, it governs." Bank of the West v. Superior Court, 833 P.2d 545, 552 (Cal.1992). Finding the language of the contract clear and explicit, the district court need not consider the context of the transaction.
 
 
 6
 NatWest also argues that the district court erred in interpreting provision 1(d) as excluding coverage for mechanics' and materialmen liens that "claimants may have by reason of work being in progress or recently completed" for both the old money and the new money. NatWest contends that provision 1(d) cannot function as an exclusion to coverage because it is not "conspicuous, plain and clear." Crane v. State Farm Fire & Cas. Co., 485 P.2d 1129, 1130 (Cal.1971); see also Interstate Fire & Cas. Co. v. Stuntman Inc., 861 F.2d 203, 204-05 (9th Cir.1988).
 
 
 7
 "[S]aid mortgage" in the prefatory language to provision 1(d) refers to the mortgage referenced in schedule A of the original policy. This mortgage serves to secure both the old and new money advances, and so this prefatory language makes it clear and explicit that the listed exclusions apply to both the old and new money. NatWest does not suggest and we cannot find an alternative interpretation of this prefatory language. See Waller v. Truck Ins. Exch., Inc., 900 P.2d 619, 627 (Cal.1995) ("[a] policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable").
 
 
 8
 Additionally, provision 1(d) clearly excludes coverage for mechanics' and materialmen liens that "claimants may have by reason of work being in progress or recently completed." It is not buried in a section that appears to extend coverage. The exceptions to coverage are conspicuously itemized in the indorsement. As these provisions are introduced by "except," there is no question that they are exclusions. NatWest does not suggest that it was unaware that these provisions acted as exclusions to coverage. With both clear prefatory language and a clear provision 1(d), the indorsement clearly and explicitly deletes coverage for mechanics' and materialmen liens that "claimants may have by reason of work being in progress or recently completed" for both the old money and the new money.
 
 3. Duty to Defend
 
 9
 NatWest contends that the district court erred in ruling that Fidelity owed no duty to defend NatWest. Because we agree with the district court that the indorsement was effective as of September 20, 1989 and that it unambiguously excluded coverage for Daniel's lien, we reject NatWest's initial argument that Fidelity owed a duty to defend NatWest in the Daniel suit because NatWest's title insurance policy continued to cover that claim.
 
 
 10
 NatWest's other arguments start from the premise that even if the indorsement excluded mechanics' lien coverage for both the old and new money, Fidelity still owed a duty to defend NatWest in the Daniel action. We disagree.
 
 
 11
 NatWest's contention that the district court violated the "no hindsight" rule, see, e.g., General Accident Ins. Co. v. West Am. Ins. Co., 49 Cal.Rptr.2d 603, 607 (Ct.App.1996), by considering evidence that Fidelity did not possess at the time it rejected NatWest's tender of defense is without merit. NatWest points to the testimony of Michael DeSilva and other witnesses who NatWest claims had no personal knowledge of when Daniel was performing or had completed work on the project. No aspect of the district court's findings of fact and conclusions of law, however, suggests that the court considered this testimony or any other evidence revealed after the tender of defense.
 
 
 12
 NatWest also claims that Daniel's complaint failed to allege that Daniel's work was either "in progress" or "recently completed" as of September 20, 1989--the date of the indorsement. NatWest claims that the facts as alleged in Daniel's complaint do not preclude the possibility that Daniel had stopped work months before September 20th, and had returned to work after that date to complete the project on September 29th.
 
 
 13
 NatWest's speculative factual scenario is farfetched in light of the other allegations in Daniel's complaint. The original complaint states that Daniel was conducting performance tests on the project as of September 25, 1989 and that the company "achieved substantial completion" on September 26th. It is unlikely that no work was in progress just a few days earlier, on September 20th. Moreover, even if Daniel had stopped working months earlier and had returned to the project after September 20th, work would still be considered to be "in progress" on the power plant as of September 20th as the term is ordinarily understood. Under NatWest's interpretation, every work stoppage--for a weekend or two-week vacation, for example--could frustrate the plain meaning of an exclusion if its effective date fell within the period of the cessation. NatWest's attempt to put the Daniel lien outside the exclusion strains credulity.
 
 
 14
 NatWest also argues that the district court's denial of Fidelity's motion for summary judgment based on its lack of a duty to defend establishes Fidelity's duty to defend as a matter of law. In making this claim, NatWest misunderstands the district court's task in ruling on a motion for summary judgment. That the court could not conclude at the summary judgement stage that Fidelity possessed sufficient information to reject the tender of defense does not mean that it could never so conclude, once it had weighed the credibility and testimony of Kaminsky, who conducted the inquiry for Fidelity in response to the tender of defense. See Bator v. Hawaii, 39 F.3d 1021, 1026 (9th Cir.1994).
 
 
 15
 Finally, NatWest claims that Daniel could have amended its complaint to state a claim potentially covered under NatWest's title insurance policy--for example, that Daniel had ceased work on July 30, 1989. NatWest's argument is flawed because "[a]n insured may not trigger the duty to defend by speculating about extraneous 'facts' regarding potential liability or ways in which the third party claimant might amend its complaint at some future date.... ' A corollary to this rule is that the insured may not speculate about unpled third party claims to manufacture coverage.' " Gunderson v. Fire Ins. Exch., 44 Cal.Rptr.2d 272, 277-78 (Ct.App.1995). The rule that the third-party claimant is not the arbiter of the policy's coverage is not an invitation to force the insurer to imagine any possible factual scenario that would bring the complaint under the policy. See id. Rather, the relevant inquiry is what facts known to the insurer at the time of the tender of defense--whether gleaned from the third-party complaint or from outside sources--create a potential for coverage. See id. at 278. Because Fidelity had no information suggesting that Daniel ceased work on July 30th at the time NatWest tendered its request for defense, Fidelity was not required to defend based on the possibility that Daniel could amend its complaint to allege that circumstance.
 
 
 16
 4. Breach of the Covenant of Good Faith and Fair Dealing
 
 
 17
 NatWest contends that Fidelity breached the implied covenant of good faith and fair dealing, included in all insurance contracts under California law, by refusing in bad faith to defend NatWest in its claim against Daniel. See Eqan v. Mutual of Omaha Ins. Co., 620 P.2d 141, 145 (Cal.1979); Tibbs v. Great Am. Ins. Co., 755 F.2d 1370, 1375 (9th Cir.1985).
 
 
 18
 The implied covenant of good faith and fair dealing is a supplement to the express contractual duty of defense that cannot exist in the absence of the primary duty. See Love v. Fire Ins. Exch., 271 Cal.Rptr. 246, 256 (Ct.App.1990). Because fidelity owed no duty of defense, it cannot have breached the implied covenant of good faith and fair dealing in rejecting NatWest's tender of defense.
 
 
 19
 5. Failure to Limit Trial to Reasonableness of Settlement
 
 
 20
 NatWest asserts that the district court should have limited the trial to the reasonableness of NatWest's settlement with Daniel because, when an insurer wrongfully refuses to defend its insured, the insured is entitled to enter into a reasonable settlement with a third-party claimant and thereafter sue the insurer to recover the amount of the settlement. This accurate statement of the law begs the very question at issue in this case: whether Fidelity wrongfully refused to defend NatWest in its suit with Daniel. Having failed to persuade the district court that Fidelity owed NatWest a duty to defend under the policy, NatWest cannot now claim that the district court erred in failing to limit the trial to whether NatWest's settlement of the uncovered claim was reasonable. Because we agree with the district court that Fidelity owed no defense duty, we reject NatWest's claim of error.
 
 6. Duty to Notify
 
 21
 NatWest argues that the exclusion is not enforceable because Fidelity did not give NatWest "conspicuous, plain and clear" notice that the indorsement deleted mechanics' lien coverage for the old money. As a repetition of NatWest's argument that the exclusion in the indorsement is not "conspicuous, plain and clear," the argument fails. As an argument that Fidelity was required to give specific additional notice to NatWest, beyond the language of the exclusion, of Fidelity's interpretation of the exclusion, the argument fares no better.
 
 
 22
 Where an exclusion in a policy is plain, clear and conspicuous, as here, and the insured did not seek clarification of the exclusion after receiving the policy, the insurer is under no duty to advise the insured of the effect of the exclusion on coverage. See Malcom v. Farmers New World Life Ins. Co., 5 Cal.Rptr.2d 584, 588-89 (Ct.App.1992). Once the exclusion itself was conspicuous, plain, and clear, Fidelity had no further duty to provide NatWest with additional notice. Consequently, NatWest's claim that the district court erred in excluding evidence on whether Fidelity gave NatWest additional notice of the exclusion fails as well.
 
 7. Exclusion of Evidence
 
 23
 NatWest argues that the district court erred in excluding evidence that NatWest never agreed to or accepted the indorsement as interpreted by Fidelity and that NatWest did not receive the coverage Fidelity promised. Further, NatWest contends the court should have permitted evidence regarding the context of the transaction, the priority of old money advances versus new money advances, and should have permitted evidence regarding the validity and enforceability of the indorsement. We review evidentiary rulings for an abuse of discretion and will not reverse absent some prejudice. See Jaurequi v. City of Glendale, 852 F.2d 1128, 1132 (9th Cir.1988).
 
 
 24
 Once the district court correctly decided at summary judgment that the plain meaning of the indorsement excluded mechanics' lien coverage for both new money and old money advances, evidence about the context of the transaction and the priority of old money versus new money became irrelevant. Evidence regarding whether NatWest agreed to deletion of mechanics' lien coverage became irrelevant at the same time. As a matter of law, NatWest agreed to the indorsement when it failed to object after receiving the indorsement with its conspicuous, plain, and clear exclusion, see Hackethal v. National Cas. Co., 234 Cal.Rptr. 853, 858 (Ct.App.1987), and thus evidence on this point was unnecessary.
 
 
 25
 NatWest failed to raise properly the issue of whether it failed to receive the coverage Fidelity promised, and thus evidence on this issue was properly excluded. Neither NatWest's denial of the allegations in paragraphs 7 & 8 of Fidelity's complaint nor the itemization of contested facts in the Scheduling Conference Order of October 13, 1993 properly raise this issue.
 
 
 26
 Nothing in NatWest's denial of the allegations in paragraphs 7 & 8 provides Fidelity with notice that NatWest would argue that Fidelity did not give NatWest the coverage Fidelity promised. In fact, NatWest admitted that Fidelity issued an indorsement to NatWest and that "the terms of the indorsement speak for themselves." Further, "[a] party must plead as an affirmative defense any ... matter constituting an avoidance.' " Northwest Acceptance Corp. v. Lynnwood Equip., Inc., 841 F.2d.918, 924 (9th Cir.1988) (quoting Fed.R.Civ.P. 8(c)). A claim of fraud must be set forth affirmatively, and as this claim is essentially a claim of fraud in the inducement, it too should be plead as an affirmative defense. NatWest did not do so and thus failed to put Fidelity on notice that this issue was contested.
 
 
 27
 Interpreting the contested facts in the Scheduling Conference Order as encompassing this issue requires a stretch not required of the district court. No rule compels district courts to interpret such orders liberally, and thus the issue of whether NatWest failed to receive the coverage Fidelity promised was not raised in the Scheduling Conference Order. With this issue not presented in either the pleadings or the Scheduling Conference Order, the district court did not abuse its discretion in excluding evidence about this issue.
 
 8. Denial of Leave to Amend
 
 28
 We review for abuse discretion a denial of leave to amend, see Texaco, Inc. v. Ponsoldt, 939 F.2d 794, 798 (9th Cir.1991), and "will not disturb the district court's decision" absent "a definite and firm conviction that the district court committed a clear error of judgment." See Jackson v. Bank of Hawaii, 902 F.2d 1385, 1387 (9th Cir.1990) (internal quotations omitted). We must also consider the strong public policy favoring amendments to pleadings, however. See Forsyth v. Humana, Inc., 114 F.3d 1467, 1482 (9th Cir.1997).
 
 
 29
 Four factors guide a court's determination of the propriety of a motion to amend: (1) undue delay, (2) bad faith, (3) prejudice to the opposing party, and (4) futility of amendment. See id. Reviewing the district court's consideration of these factors, we find no abuse of discretion.
 
 
 30
 (a) Undue Delay
 
 
 31
 The district court did not abuse its discretion in concluding that NatWest's delay in attempting to amend its counterclaim was unreasonable. We have held that a factor "[r]elevant to evaluating the delay issue is whether the moving party knew or should have known the facts and theories raised by the amendment in the original pleading." Jackson, 902 F.2d at 1388. NatWest should have learned of the facts supporting its fraud and breach of contract claims when its counsel, Justine Clark, reviewed the indorsement and its exclusion of mechanics' lien coverage in December 1989 or January 1990. As an agent of NatWest in the negotiations over the indorsement, Clark's knowledge of the language in the indorsement is imputed to NatWest. See Powell v. Goldsmith, 199 Cal.Rptr. 554, 556 (Ct.App.1984).
 
 
 32
 Moreover, NatWest fails to justify the seven-month delay between the time it concedes it knew of the facts surrounding Fidelity's alleged unilateral insertion of the exclusion and its motion for leave to amend its counterclaim. Citing cases concerning the duty to conduct a reasonable inquiry before filing a pleading in order to steer clear of sanctions under Rule 11, NatWest asserts that its delay was justified by its need to corroborate Clark's testimony before filing its amended counterclaim. NatWest points to nothing it learned from its further inquiry, however, that persuaded it of the validity of Clark's testimony. We have previously refused to countenance a delay in amending a complaint where the movant argued that evidence was not " 'fully flushed out' " and required additional corroboration, but could not cite "facts or theories gleaned from the additional discovery period to support [its] contention." Jackson, 902 F.2d at 1388. In the absence of evidence that this additional inquiry was necessary or productive, NatWest cannot justify its delay.
 
 
 33
 (b) Bad Faith
 
 
 34
 The district court's ruling that NatWest acted in bad faith in intentionally delaying its request to amend its counterclaim is also supported by the record and is thus not clearly erroneous. See United States v. Pend Oreille Pub. Util. Dist., 28 F.3d 1544, 1553 (9th Cir.1994). NatWest's counsel informed the court that he failed to notify Fidelity of NatWest's intent to assert new claims because he wanted the opportunity to depose Fidelity's witnesses without "tipping them off." NatWest caused Fidelity to conduct and defend depositions without the benefit of a counterclaim setting forth all the issues at stake in the litigation, while it approached those same depositions with full knowledge of the new claims it intended to raise. Given these admissions, the district court did not clearly err in finding that NatWest acted in bad faith.
 
 
 35
 (c) Prejudice
 
 
 36
 The district court's conclusion that Fidelity would be prejudiced by the amendments to NatWest's counterclaim is also supported by the record. The proposed new claims, premised on Fidelity's alleged unilateral modification of the indorsement and insertion of the exclusion, are based on new facts regarding the negotiation process that the district court justifiably concluded would require additional discovery. We have found prejudice sufficient to justify a denial of leave to amend where discovery would similarly have to be duplicated or recommenced. See Pend Oreille, 28 F.3d at 1552-53; Jackson, 902 F.2d at 1387-88. The district court's conclusion was not clearly erroneous.[1]
 
 
 37
 9. Evidence that Lien Fell Within Scope of Exclusion
 
 
 38
 NatWest claims that Fidelity failed to prove that Daniel's lien fell within the scope of the exclusion because Fidelity failed to present sufficient evidence that the lien was "by reason of work being in progress or recently completed" on September 20, 1989. We conclude, however, that the district court's finding that "Daniel was performing work ... up until the date on which it turned over care, custody, and control of the Power Plant, a date after September 20, 1989" is supported by the record and is thus not clearly erroneous. See Fed.R.Civ.P. 52(a).
 
 
 39
 Despite NatWest's assertions that the only evidence Fidelity presented concerning when Daniel was performing work on the project was the testimony of Michael DeSilva, the evidence before the district court reflects several other sources of information about the period of Daniel's construction activity. First, Fidelity introduced evidence from the Partnership confirming that mechanical completion of the plant was achieved after September 20, 1989 and that Daniel conducted performance tests at the site on September 25, 1989. Fidelity introduced a certificate of substantial completion that the Partnership issued to Daniel which stated that Daniel was still performing work under the contract as of September 25, 1989. In addition, Fidelity introduced a letter from the Partnership's counsel stating that, as of September 1, 1989, work on the Madera plant was 95% complete. Fidelity also introduced evidence that, in a letter to the State of California dated September 21, 1989, the Partnership attested to the accuracy of its Preliminary Official Statement to be used in the public bond financing. That statement reported that "the facility is currently under construction by Daniel, and substantial completion is expected to occur in the fourth quarter of 1989." Reading these pieces of evidence together, the district court reasonably concluded that work was being performed, or was recently completed, as of September 20, 1989.
 
 
 40
 Moreover, as the Daniel executive in charge of the Madera project, DeSilva was competent to testify about when Daniel was performing work on the plant. DeSilva testified that, after conducting an investigation, he personally verified Daniel's complaint. That complaint alleged that Daniel was still conducting performance tests on September 25, 1989 and had substantially completed the project as of September 26, 1989. DeSilva was also responsible for ensuring that Daniel's mechanic's lien was recorded in accordance with California law. He testified that the lien was properly recorded within ninety days after completion of work, so that work could not have been completed prior to September 29, 1989. In addition, DeSilva testified that Daniel was working under the contract as of September 20, 1989.
 
 
 41
 NatWest implies that the only way for Fidelity to carry its burden was for it to call witnesses who were at the construction site on September 20, 1989. However, the district court could draw reasonable inferences from the other evidence Fidelity presented, and, indeed, NatWest presented no evidence to the contrary. Because the court's finding is supported by the evidence presented at trial, it is not clearly erroneous.
 
 10. Equitable Subrogation
 
 42
 NatWest contends that the district court erred in not granting its motion for summary judgment that the doctrine of equitable subrogation eliminated Fidelity's third and fourth affirmative defenses. The district court did not rule on Fidelity's third and fourth affirmative defenses, however, because it concluded that the indorsement unambiguously excluded mechanics' lien coverage. It thus never had to reach the question of whether equitable subrogation eliminated these defenses. We therefore reject NatWest's claim of error.
 
 
 43
 AFFIRMED.
 
 
 
 **
 The Honorable Dean D. Pregerson, United States District Judge for the Central District of California, sitting by designation
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Because we affirm the district court's denial of leave to amend on the basis of its findings of undue delay, bad faith, and prejudice, we need not decide whether the new claims NatWest attempted to assert would be time-barred