**WESTERN PARCEL EXPRESS,**
Plaintiff,

v.

**UNITED PARCEL SERVICE
OF AMERICA, INC., et
al., Defendants.**

No. C–96–1526–CAL.

United States District Court,
N.D. California.

June 15, 1998.

opposing papers, the records submitted by both sides in connection with the motion, the record of the case, the applicable legal authorities and the arguments of counsel.

### I.

Since this is a motion for summary judgment, this court is governed by the standards of Rule 56 of the Federal Rules of Civil Procedure. That is, summary judgment can be granted only if there is no genuine issue of material fact. When the record as a whole could not lead a rational trier of fact to find for the non-moving party, here the plaintiff, there is no genuine issue of material fact for trial. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *In re Super Premiu¹ Ice Cream Distribution Antitrust Litigation,* 691 F.Supp. 1262, 1265 (N.D.Cal.1988), *aff'd sub nom. Haagen-Dazs Co., Inc. v. Double Rainbow Gourmet Ice Creams, Inc.,* 895 F.2d 1417 (9th Cir.1990).

Defendant bears the initial burden of "informing the district court of the basis for its motion and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

"In opposing a motion for summary judgment in an antitrust case, the non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Sicor Ltd. v. Cetus Corp.,* 51 F.3d 848, 853 (9th Cir.1995), *quoting Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. The burden shifts to plaintiff to go beyond the pleadings and present *specific facts* showing that, despite defendants' contentions, there is a genuine issue of fact which requires a trial. *Sicor,* 51 F.3d at 853, *citing Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. The evidence presented must be viewed in a light most

John Paul Fischer, Silver Rosen Fischer & Stecher, San Francisco, CA, Thomas J. Gundlach, Thomas J. Gundlach Law Offices, San Francisco, CA, Lawrence Mann, Lawrence Mann Law Office, San Francisco, CA, for plaintiff.

Paul T. Friedman, Morrison & Foerster LLP, San Francisco, CA, for defendants.

### OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT

LEGGE, District Judge.

Defendants have moved for summary judgment. The motion was opposed, briefed, argued and submitted for decision. The court has reviewed the moving and

favorable to plaintiff to determine whether genuine issues of material fact exist. *See Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989). If the pleadings, affidavits and other material present no genuine issues of material fact, defendant is entitled to judgment. *Sicor*, 51 F.3d at 853.

The same summary judgment standards apply in an antitrust case such as this. The facts stated in this opinion and order are found to be facts by a measure of no genuine issue of material fact.

## II.

Plaintiff Western Parcel Express ("WPX") alleges that since 1994 the United Parcel Service defendants (collectively "UPS") have violated the federal antitrust laws and California state law in competing with WPX in the regional, business-to-business, small package delivery market in the western United States. As a result of motions to dismiss (Order of December 3, 1996), certain of WPX's claims were dismissed, leaving three federal antitrust claims.

WPX's federal claims accuse UPS of violating both Sections One and Two of the Sherman Act. 15 U.S.C. §§ 1 and 2. WPX makes two claims under Section Two, alleging that UPS monopolized and attempted to monopolize, by predatory pricing of its delivery services, the intrastate small package delivery market in which WPX operates. WPX's Section One claim alleges that UPS used exclusive-dealing contracts to offer below-cost prices, and thereby illegally restrained competition in WPX's market area.

In May 1997, the parties stipulated to and the court ordered a bifurcation of the discovery. The subject of the first discovery was what the parties termed the "Market Power Issues." The Market Power Issues were defined as (1) the definition of the relevant market, (2) the division of market shares in the relevant market, and (3) the existence of any barriers to entry or expansion in the relevant market.

After the discovery on the Market Power Issues was completed, UPS filed this motion for summary judgment. UPS argues that because WPX does not and cannot define a relevant market, and cannot show that UPS possesses sufficient market power to recoup an investment in below-cost pricing, UPS is entitled to summary judgment on both of WPX's Section two claims. UPS similarly argues that because WPX cannot show that it experienced any causal anti-trust injury, or that UPS's contracts are exclusive dealing, UPS is also entitled to summary judgment on WPX's Section One claim.

After WPX filed its opposition and UPS replied, the court heard oral argument. At the hearing WPX requested leave to file a supplemental brief to supply the court with additional legal authority and additional evidence in support of its opposition. After the parties filed their supplemental briefing, the court took the motion under submission.

## III.

Because of the nature of these anti-trust claims, some discussion is necessary of the industry in which these parties and others operate. The following facts are either admitted or are demonstrated with no genuine issue.

The package delivery industry is a multi-billion dollar, international industry. In the United States more than 70% of all deliveries are accomplished by ground transportation, primarily through intra- and inter-state trucking. So called "small" parcels are packages of limited dimensions weighing up to 150 pounds. And so called "regional" or "intrastate" shipping describes deliveries going to destinations within 450–500 miles of their origin. Regional services are typically provided to customers with large and consistent volumes of shipping through contractual arrangements ("contract carrier service"). The same services are provided to the smaller customers with intermittent ship-

ping needs through standard terms ("common carrier service").

Prior to nationwide deregulation of intrastate trucking in 1995, the regional markets were dominated by small regional carriers, with some competition from regional less-then-truckload carriers ("LTLs"). For a variety of reasons, the larger national carriers did not compete with the regional carriers. Local delivery carriers were also ineffective competition to the regional carriers due to their limited local service areas. National LTLs did not effectively compete in the regional markets for a variety of reasons.

The Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), implemented in January 1995, marked the culmination of nearly two decades of Congressional effort to deregulate competition in the trucking industry. *See* 49 U.S.C. § 41713(b)(4). The most important impact of the FAAAA on the intrastate trucking business was to eliminate extensive and costly federal regulatory requirements, which previously served as a barrier to new entries into the market. Those regulations controlled pricing and limited the routes of carriers. Congress envisioned that without such regulations, market forces would dictate pricing and routing in the most efficient manner and would open the intrastate trucking markets to more competition.

At the same time, technological innovations in Logistical Information Services ("LIS") allow customers to become more precise in scheduling their shipping needs. Customers desire "just in time" delivery service in order to reduce their inventory costs. As a result of deregulation and LIS, carriers have diversified their shipping services. Numerous "deferred" services, such as second-day and third-day delivery options, were added to the basic services previously provided. These additional services have resulted in a continuum of shipping options available to customers. The options also make it economically beneficial for some customers to use only one carrier to handle all of their shipping needs, regional and otherwise ("single sourcing").

The result has been a substantial increase in competition for regional small package delivery business. Both large and small carriers have restructured their operations to reach customers they were previously unable to serve. Customers, having shipping options and LIS systems, can now compare carrier options and prices to meet their needs. The competition for their business is intense and customer "churning," *i.e.* repeated carrier switching by the customers, is common. But so is single sourcing. WPX and UPS compete for the regional small package shipping business of customers in the western United States.

Plaintiff WPX specializes in the regional ground-based delivery of small packages. From a small beginning in 1978, it has grown significantly and now has 700 employees, serves 15,000 customers, and earns $100 million in revenues annually. In 1996, WPX handled more than six million packages. Part of WPX's growth came from its acquisition of other regional, local, and LTL carriers. It now provides intrastate shipping services in ten western and mountain states.

Prior to 1994, governmental regulation of the intrastate trucking industry by the State of California provided WPX with some protection against new entrants into the California market, which was a significant portion of WPX's market. However, in 1994 California deregulated pricing, routing, and service offerings in the small-package carrier industry in California. *See In the Matter of United Parcel Service, Inc.*, No. 92–02–026, 1996 WL 754702, 1996 Cal. PUC LEXIS 1221, at *3 n. 1 (Dec. 20, 1996). UPS was one, but only one, of the national shippers to enter the California market after California deregulation went into effect.

Since deregulation in California in 1994, WPX's profit margins have decreased. The implementation of the FAAAA in 1995 also negatively impacted WPX's profit

margins Nonetheless, WPX reported its pre-tax profit margins as almost 20% for the years 1994 through 1996. WPX blames the decrease in its profit margins almost exclusively upon UPS's entry into the intrastate market. However, while WPX's profit margins may have shrunk, WPX's revenues have grown from $29.4 million in 1994 to $47 million in 1997.

Defendant UPS provides local, regional, national, and international shipping services. UPS's 1996 financial statements indicate that it handled over 12 million packages for 1.4 million customers, generating an after-tax profit of approximately $1.1 billion dollars. It employs over 330,000 employees at approximately 1,500 operating facilities. The statements suggest that over 90% of UPS's revenue is from ground based deliveries for both residential and business customers.

In 1994, UPS began to compete with WPX and other regional carriers. At first that competition was limited to California. But once the FAAAA was implemented in 1995, UPS entered the regional shipping markets in most of the other western states. UPS documents show that by 1996 UPS was promoting itself as a single sourcing option for customers, and was offering volume discounts as incentives for customers to use UPS for the majority of their shipping needs. By 1997, more than 20 of WPX's past customers had switched to UPS, some on the basis of the single sourcing option available from UPS.

WPX and UPS are not the only carriers providing shipping services in the western United States. There are many national, regional, and local carriers providing a variety of services. The large national carriers include RPS, Federal Express ("Fedex"), and the United States Postal Service ("USPS").

RPS focuses on business-to-business small package delivery. Its 1996 annual revenue exceeded $1.3 billion. Through September 1997, RPS's revenue year-to-date was $1.1 billion, up 19% from the same period in 1996. Until 1995, RPS provided only long-haul business-to-business services. However with deregulation of the industry in 1995, RPS entered the regional market. RPS provides regional service throughout large portions of five western states.

Fedex competes for time-sensitive delivery of packages throughout the nation. It offers a variety of delivery options for business-to-business delivery of small packages. In 1995, shipping industry analysts viewed Fedex's expansion into the ground delivery business as part of an industry trend to compete with regional carriers like WPX. Fedex's 1996 Annual Report highlighted its commitment to serve the ground-based time-sensitive regional delivery market. In October 1997, Fedex announced it intended to acquire the corporate parent of RPS and Viking Freight.

USPS competes in the delivery of smaller packages, up to 70 pounds, offering its services throughout the nation. In 1997 USPS announced a major initiative to update its tracking technology, with specific mention of improving its overnight and deferred services. WPX's expert notes that USPS's successful response to the 1997 Teamster/UPS strike established USPS as an acceptable alternative for business-to-business package delivery.

Of the regional carriers operating in the west, WPX is the largest. However, there are several others. They include California Overnight and Golden State Overnight. In 1995 WPX merged with Air Data Express, a regional carrier serving the Pacific Northwest. In 1996, WPX acquired two more regional carriers in Oregon and Texas.

National and regional LTL carriers are also active in the west. LTL carriers sell excess space on trucks already scheduled for long-haul or multistate shipping routes. Industry analysts note that the shift to options like just-in-time delivery have made LTLs available regional alternatives for some customers.

Local carriers also provide delivery of small packages and some LTL services, within limited geographic areas. Most are small, privately held companies, more like local couriers than large shipping companies. There are at least seventy such companies operating in California. While these carriers provide basic delivery options for customers with local needs, some provide alternative regional delivery services.

A final option are the private delivery fleets operated by customers themselves. Many companies choose to have their own fleets to accomplish their distribution needs. Although there is little industry analysis of the impact of these private fleets on the intrastate trucking market, private fleets are another option for customers.

The record demonstrates that the market for the regional delivery of small packages is competitive. Customers have a wide continuum of choices of services and carriers. The deregulation legislation is apparently having its over-all intended effect. The question in this case is whether defendant UPS has nevertheless acquired and exercised monopoly power in a relevant sector of the market, and has engaged in predatory pricing.

### IV.

WPX alleges that since May 1994 UPS has used monopoly power to predatorily price its regional shipping services to eliminate WPX as a competitor in the regional market in the western United States. WPX contends that UPS dominates the regional market and that WPX is UPS's only significant competition.

■ A Section Two monopoly claim based on predatory pricing requires the plaintiff to show that the defendant possesses, or is likely to possess, monopoly power in a relevant market. *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir.1995). Monopoly power may be shown by direct evidence of defendant's restriction of services or charging of supra-competitive prices. *See*

*Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475 (9th Cir.1997), *citing Rebel Oil*, 51 F.3d at 1434. In absence of direct evidence of market power, plaintiff may use circumstantial evidence to show that defendant possesses monopoly power or is likely to possess it. *Forsyth*, 114 F.3d at 1475. Showing monopoly power by circumstantial evidence requires plaintiff to define the relevant market, show that defendant controls a dominant share of that market, and show that there are significant barriers to the entry of new competitors or to the expansion of existing competitors. *Id.* at 1476.

■ WPX also claims that UPS's predatory pricing violates the "attempt to monopolize" language of Section Two. WPX alleges the same facts as in its monopoly claim, with the one difference that UPS intends to, but has not yet, monopolized the relevant market. To establish a Section Two claim for attempted monopoly WPX must show four basic elements: 1) specific intent to control prices or destroy competition; 2) predatory or anti-competitive conduct directed at accomplishing that purpose; 3) a dangerous probability of achieving monopoly power; and 4) causal antitrust injury. *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811 (9th Cir. 1988). Because the discovery leading to this motion was limited to the Market Power Issues stated above, only consideration of the last two elements is possible upon the evidence presented.

To show that UPS has a "dangerous probability of achieving monopoly power" in the relevant market, WPX must provide evidence that UPS's pricing will likely help it achieve a dominant share of the relevant market such that UPS can later recoup the losses it sustains by below-cost pricing.

Therefore, the same Market Power Issues are important to an analysis of both the monopoly and attempted monopoly claims.

## V.

■ Central to plaintiff's claims of monopoly and attempted monopoly is the necessity to define a relevant market. It is not possible to analyze the alleged monopoly impact of UPS's conduct without first defining the relevant market which such conduct is allegedly monopolizing. *See Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 455–56, 113 S.Ct. 884, 890, 122 L.Ed.2d 247 (1993); *Thurman,* 875 F.2d at 1373 ("defining the relevant market is indispensable to" Section Two monopolization claims).

■ A relevant market is generally defined as a pool of services that are reasonably interchangeable and are therefore economic substitutes for one another. *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,* 924 F.2d 1484, 1489 (9th Cir.1991). Without the definition of an appropriate relevant market, it is not possible to determine the impact of a defendant's conduct upon the competition in the market. *Spectrum Sports v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 890, 122 L.Ed.2d 247 (1993); *Rebel Oil Company, Inc. v. Atlantic Richfield Company,* 51 F.3d at 1434. Plaintiff has the burden of proving the scope of the relevant market, which typically is defined by the relevant product market and the relevant geographical market. *See, e.g., United States v. Grinnell,* 384 U.S. 563, 575–76, 86 S.Ct. 1698, 1706, 16 L.Ed.2d 778 (1966); *Morgan,* 924 F.2d at 1489–90.

"[D]efining the product market involves identification of the field of competition: the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business," while "a geographic market is 'an area of effective competition' where buyers can turn for alternate sources of supply." *Morgan,* 924 F.2d at 1489–90. In practice, economists provide the court with expert testimony to explain the relevant market and to measure the impact of the allegedly illegal conduct. *See, e.g., U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 599 (1st Cir.1993).

WPX argues that the definition of the relevant market is an issue for the jury, and thus it is not appropriate for the court to rule on the relevant market in this motion. *See Image Tech. Services, Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1203 (9th Cir.1997) ("Ultimately what constitutes a relevant market is a factual determination for the jury"). However, as with any issue of fact, if no genuine issue exists, or if plaintiff has failed to carry its burden of going forward with the evidence, summary judgment is appropriate. *See Morgan,* 924 F.2d at 1489–90; *In re Super Premium Ice Cream,* 691 F.Supp. at 1268. It is therefore proper for this court to examine the record and the law, to decide if there are genuine fact issues concerning the relevant market.

In its complaint, WPX defined the relevant market as "the time sensitive transportation by ground based delivery from one place of business to another place of business of small packages or parcels, generally weighing between one pound and one hundred and fifty pounds, in intrastate and interstate commerce within the Western United States." WPX then further described the relevant market by delineating the product and geographic components. The relevant product market was defined as the time sensitive delivery of small parcels over variable distances, but most commonly consisting of delivery within 150 miles in two days. The relevant geographic market was described as California, Arizona, Nevada, Oregon, Washington, Idaho, Montana, Utah, and Alaska.

UPS argues that this definition is so broad that the shipping services of all carriers must be considered in order to analyze that market and the impact of UPS's conduct in that market. UPS has provided factual evidence and the opinion of an expert with significant experience in antitrust and economic issues in the package delivery industry. The conclusion from that record is that after deregulation and LIS, customers view the shipping market as a continuum of all shipping services,

which are interchangeable depending upon need and price. The services need not be identical to be considered reasonably interchangeable. The determination of whether a service is reasonably interchangeable requires consideration of the cross-elasticity of demand. *United States v. E.I. duPont de Nemours and Co.*, 351 U.S. at 377, 394, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). If customers respond to a small price change in a service by changing to another provider, there is a high cross-elasticity of demand between the services. In such a case, the services are reasonably interchangeable and therefore compete in the same market. UPS argues that based on the record it could not attain market power because so many alternatives exist for customers that any attempt to charge high prices would open the door for competitors.

WPX then proposed a different relevant market. Its amended definition was the market for regional time-definite, ground-based delivery of small parcels in California, Arizona, Nevada, and in portions of Utah. WPX argues that in this narrower market, WPX and UPS are the only carriers competing for regional contract carrier services, and that since UPS has underbid and thereby obtained some of WPX's customers in this market, UPS now possesses an illegal monopoly. WPX provides certain evidence in support of its arguments. And WPX includes numerical calculations intended to show that UPS is predatorially pricing its regional small parcel delivery service in the market as WPX defines it. WPX did not, however, answer the thrust of UPS's arguments or evidence.

UPS in reply again submitted a report from its expert, in which the expert stressed several weakness in WPX's theories, highlighted evidence that WPX excluded or failed to answer, and explained that even if WPX's new market definition were correct, WPX could still not show that UPS possessed market power.

In WPX's supplemental brief, it again changed its definition of the relevant market. It has narrowed the definition to include only the overnight, ground-based regional small package delivery service to wholesale distributors who need to ship products within approximately 500 miles of their strategically located warehouses. UPS replies that even this narrower definition does not represent the realities of a market, could not be a relevant market for antitrust purposes, and does not rebut the evidence UPS previously presented. UPS again argues that because WPX has not responded to the evidence UPS presented concerning the relevant market, summary judgment is appropriate.

WPX's efforts to redefine and narrow its alleged relevant market may be procedurally improper. *See International Telephone & Telegraph Corp. v. General Telephone & Elec. Corp.*, 518 F.2d 913, 934 (9th Cir.1975) (plaintiff's failure, in its pleadings, to include certain products in its definition of the relevant product market was binding); *Continental Trend Resources, Inc. v. OXY USA Inc.*, 44 F.3d 1465, 1481 n. 19 (10th Cir.1995) (preventing plaintiff who pleaded broad, multi-state relevant market from revising the definition during the course of the litigation to narrow it). But even if some narrower definition were legally appropriate, it is not supported by the record here. The parties have developed the record through lengthy discovery on the issue. And the record does not support, factually or legally, plaintiff's claimed market.

WPX attempts to narrow the defined market in order to identify a small market in which UPS might have monopoly power. WPX's attempt to define the market on the basis of price or product variances is contrary to case law holding that "[s]uch distinctions are economically meaningless where the differences are actually part of a *spectrum* of price and [product options]." *In re Super Premium Ice Cream*, 691 F.Supp. at 1268 (emphasis in original). *See also Brown Shoe Co. v. United States*, 370 U.S. 294, 326, 82 S.Ct. 1502, 1524–25, 8 L.Ed.2d 510 (1962). (explaining that pricing in a wide market does not provide a

rational way to subdivide a market into antitrust relevant markets). And the record here shows both a spectrum of consumer choices, and active competition for those choices. Both UPS's and WPX's expert reports describe the shipping options available to consumers in the so-called regional shipping market. UPS's expert explained, and WPX's experts confirmed, that deregulation and advanced LIS technology have significantly increased the diversity of this spectrum.

WPX attempts to establish its relevant market position by the reports of two experts. However, neither has a background in antitrust economics, both disclaimed expertise in antitrust law in their depositions, and neither has offered an opinion on the definition of relevant markets in antitrust litigation. And neither has responded to UPS's evidence or expert's report.

■ On summary judgment, this court is not to weigh the credibility of the evidence presented, but rather decide whether the evidence presents a genuine issue of fact. But assertions in expert declarations do not automatically create genuine issues of fact. *Rebel Oil,* 51 F.3d at 1440. When expert opinions are not supported by sufficient facts, or when the indisputable record contradicts or otherwise renders the opinions unreasonable, they cannot be relied upon. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 242, 113 S.Ct. 2578, 2598, 125 L.Ed.2d 168. "[E]xpert opinion evidence ... has little probative value in comparison with the economic factors" that may dictate a particular conclusion. *Matsushita,* 475 U.S. at 594 n. 19, 106 S.Ct. at 1360 n. 19. Expert declarations may be useful as a guide in interpreting market facts, but they are not a substitute for competent economic evidence. *Brooke Group,* 509 U.S. at 242, 113 S.Ct. at 2598. The opinion of WPX's experts do not create genuine fact issues about the definition of the relevant market.

Plaintiff's citation to *Forsyth v. Humana,* 114 F.3d 1467, is pertinent to the definition of a relevant product market in a Section Two case. But plaintiff cannot use that authority to define a relevant market as narrow as it contends. Plaintiff argues from *Forsyth* that price differentials alone may serve to create different relevant markets. To the extent that *Forsyth* so indicates, it was where the demand for one product showed no relationship to the price for the other. But plaintiff's evidence here does not establish such a factual predicate. As stated, the customers in this industry view shipping services as a continuum of shipping options and prices. While *Forsyth* is properly cited for the proposition that direct evidence of market power can defeat the need to provide circumstantial evidence of market power, the evidence here does not support the argument which plaintiff makes about pricing in this industry.

By a standard of no genuine issue of material fact, this court therefore determines that plaintiffs' attempted definition of a relevant market, even in its most narrow form, is not acceptable either legally or factually. At the very least, plaintiff has failed to meet its burden of going forward with the evidence on this issue under the standards of *Celotex* and *Matsushita.*

### VI.

■ The lack of a defined relevant market might eliminate the necessity for this court to examine any further questions about UPS's alleged market power. However, it is apparent from the record that under any definition of a relevant market, UPS does not have the necessary market power for purposes of the anti-trust laws. Since the parties have conducted extensive discovery on this issue and have discussed it in their briefs, some consideration by the court is therefore appropriate.

The showing of a defendant's significant market share is essential to proving a predatory pricing claim, because it relates to the power to charge supra-competitive prices in the market. And a showing of market share is one of the requirements

for a circumstantial showing of market power. *Rebel Oil,* 51 F.3d at 1434. Market share data must reflect the actual circumstances in a relevant market and must not be extrapolated from separate or parallel markets. *See, e.g., Morgan,* 924 F.2d at 1491; *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 749 (3rd Cir. 1996); *Bell v. Dow Chem. Co.,* 847 F.2d 1179, 1184 (5th Cir.1988).

UPS argues that even if WPX's definition of a relevant market were proper, WPX has not presented adequate evidence of UPS's market.

WPX argues that UPS possesses an 83% share of the relevant market. However, the 83% number was taken from a 1994 UPS business plan for its West Los Angeles District, and it represents UPS's market share of *all* ground shipping, not just time-sensitive, and only in West Los Angeles. WPX cannot extrapolate this number to represent UPS's market share of the entire claimed relevant market. *See, Morgan,* 924 F.2d at 1491. WPX's expert reports and WPX's other evidence do not provide a reasonable estimate of UPS's market share of any market, be it the relevant market defined in the complaint or the narrower market WPX now proposes.

WPX argues that the market share figure presented by UPS's expert, 20–25%, is imprecise and based on faulty assumptions. It is indeed imprecise. However, the argument is insufficient for two reasons.

First, UPS's expert disclaimed that his market share estimation was precise. He stated that the statistics needed to prepare an accurate market share estimate are simply not in existence. He explained that the reason no such statistics exist is because neither industry analysts nor shipping companies collect data on a market defined by overnight, ground-based business-to-business delivery of small parcels. He also explained that he had to base his estimate on market statistics that do not separate business from residential delivery.

Second, and more important, UPS does not have the burden of proving its market share. Rather, UPS's burden is to make a *prima facie* showing that WPX does not present sufficient evidence to show that UPS has a significant market share in a relevant market. UPS did that by showing that because WPX's market definition was erroneous WPX could never show UPS's market share. WPX's burden was then to show sufficient evidence of UPS's market share in a relevant market to create a genuine issue. It has not done so.

WPX argues that it need not provide market share data because UPS conceded market power in another antitrust case involving regional shipping. *See General Parcel Service, Inc. v. United Parcel Service of America, Inc.,* Civ. Action No. 1:95–CV–0320–RCF, Slip Op. at 5 (N.D.Ga. Aug. 30, 1996). However, the court in the *GPS* case noted that UPS's concession was not binding outside the consideration of that motion. UPS made the concession of market power in order to expedite the resolution of that predatory pricing case, because GPS could not show that UPS's prices were predatory regardless of the market power issues. Facts established by stipulations or concessions *arguendo,* rather than by judicial resolution, are not fully litigated and do not have collateral estoppel effect. *See Sekaquaptewa v. MacDonald,* 575 F.2d 239, 247 (9th Cir. 1978).

Given the lack of an adequately defined relevant market, WPX does not present adequate evidence of UPS's market share. Even assuming that WPX's redefinition of the relevant market is accurate, it does not offer adequate evidence on the market share issue. The court therefore concludes that WPX has failed to provide sufficient evidence to create a genuine issue of fact concerning UPS's market share in a relevant market.

## VII.

■ Another step in the analysis of the market power issue is to examine whether

there are barriers to the entry of new competitors, or barriers to the expansion of existing competitors, in the market.

A plaintiff in a predatory pricing claim "must show that new rivals are barred from entering the market...." *Rebel Oil,* 51 F.3d at 1439. A barrier to entry is an obstacle that is "capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting." Areeda & Turner, *Antitrust Law,* ¶ 727d. The Ninth Circuit has recognized five types of entry barriers: (1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) considerations imposing higher capital costs on new entrants; and (5) in some situations, economies of scale. *Rebel Oil,* 51 F.3d at 1439.

WPX argues that large capital costs associated with entrance into the regional shipping market is a significant barrier to entry. It further argues that the need for a regional carrier to maintain high delivery density is also a barrier to entry. Delivery density refers to the ability of a carrier to make multiple deliveries to each individual location served, thereby maximizing the revenue per stop. WPX argues that delivery density is essential to the success of any regional carrier. UPS counters that simply because setup and maintenance costs are high does not mean that entrance of new competitors is precluded. Further, UPS attacks the delivery density argument as being illogical; that is, if delivery density were a pre-requisite to entry, then no new regional carrier could ever successfully start operations.

WPX highlights its capital costs during its recent expansion, noting that it had to borrow to finance the expansion of its business by the acquisition of other regional carriers. Borrowing money to *expand* a market is not really relevant as a barrier to entry. But even if this evidence were relevant, "[t]he mere fact that entry [would require] a large absolute expenditure of funds does not constitute a 'barrier to entry;' a new entrant is disadvantaged only to the extent that he must pay more to attract those funds than would an established firm." *Los Angeles Land Co. v. Brunswick Corp.,* 6 F.3d 1422, 1428 (9th Cir.1993) *quoting* 2 Areeda & Turner, Antitrust Law ¶ 409e at 303. WPX's argument is also answered by the fact that WPX was successful in obtaining the money and in expanding.

WPX's argument about delivery density is also unsupported by the record. First, if delivery density were a significant barrier, neither WPX nor RPS could have attained the success they have. Both started small and expanded with or without delivery density. Additionally, if the court were to assume that WPX's narrow market definition is a true relevant market, UPS's entrance into the market in California in 1994 also answers WPX's density argument. The delivery density argument is really an explanation of price/volume discounting, and is not an explanation of a barrier to entry. It merely explains that delivery density lowers costs, and that lower costs obviously help a carrier maintain profitability. WPX's ability to develop delivery density is perhaps partially responsible for the profit margins WPX enjoyed prior to deregulation. However, no evidence presented by WPX explains how delivery density is a barrier to entry. And WPX offers no evidence to contradict UPS's evidence that delivery density, while perhaps forcing a new entrant to focus on a smaller piece of the market before expanding into the whole market, is not a barrier to entry.

Therefore, the court must conclude that WPX has not presented sufficient evidence to create a genuine fact issue on the existence of barriers to entry.

A showing that there are barriers to the expansion of existing competitors is also relevant to prove market power. *Rebel Oil,* 51 F.3d at 1439. WPX does not discuss this issue in its opposition to UPS's motion. Moreover, in both 1995 and 1996, WPX successfully expanded by acquiring at least two regional carriers in the geo-

graphic market it defined in its complaint. But more important in a summary judgment motion, WPX does not contest UPS's evidence or legal authority on the issue. WPX has thus failed to carry its burden to show that their are genuine issues of fact concerning barriers to expansion.

Finally, as discussed above in section III, numerous competitors to both WPX and UPS have in fact entered and are serving the market. This record shows that there are not material barriers to entry and expansion, and that the market is competitive.

## VIII.

Plaintiff's allegations of predatory pricing by UPS are also interwoven with the issues of monopoly, attempted monopoly, and whether there has been an anti-trust injury.

Predatory pricing is generally thought to occur in two stages. *Rebel Oil,* 51 F.3d at 1433. First, the alleged predator prices its goods or services below its marginal cost for those goods or services. *Id.* It hopes that, in the long run, such a price war will drive competitors from the market and thereby increase both its market share and market power. *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 117–18, 107 S.Ct. 484, 493, 93 L.Ed.2d 427 (1986). In the short term, the alleged predator, and any competitor that matches its predatory prices, suffers losses. However, because consumers get the benefit of the lower prices, there is no actionable harm to competition and no actionable antitrust violation in that first step. *Brooke Group,* 509 U.S. at 224, 113 S.Ct. 2578, *quoting Brown Shoe v. United States,* 370 U.S. at 320, 82 S.Ct. 1502 ("it is axiomatic that the antitrust laws protect competition not competitors").

In stage two, the alleged predator seeks to recoup the losses that it suffered during stage one by charging supra-competitive prices, *i.e.* prices above competitive levels. *Rebel Oil,* 51 F.3d at 1434. At the time the predator implements stage two, it must possess enough market power so that

by restricting its own output, it can restrict the supply to the market. Supply restrictions artificially increase demand and thus allows the predator to maintain its supra-competitive prices. *See* Areeda & Turner, Antitrust Law ¶ 501, at 322. However, without market power, the predator's recoupment will be thwarted by competitors who will offer their services at prices below the predator's supra-competitive prices. And unless the predator is capable of recoupment, predatory pricing does not hurt consumers. *Brooke Group,* 509 U.S. at 224–25, 113 S.Ct. 2578.

■ WPX has not presented adequate evidence about UPS's pricing under that analysis. This prevents WPX from establishing causal antitrust injury, the type of injury the antitrust laws were designed to prevent. Predatory pricing is only harmful when the predator succeeds in recouping the losses it suffered by its earlier below-cost pricing. Even if the allegations of below-cost pricing were true, WPX provides no market evidence that suggests UPS is likely to gain such monopoly pricing power.

WPX relies on *Marsann Co. v. Brammall, Inc.,* 788 F.2d 611 (9th Cir.1986), for the proposition that where proof of harm to competition is apparent, failed or impossible market analysis should not cause a case to be dismissed. In *Marsann* the district court granted summary judgment on the ground that the plaintiff could not show with precision that predatory prices were charged. *Id.* at 613. The Ninth Circuit reversed, suggesting that absolute precision was not required in calculating the predatory price figures. *Id.* at 615. *Marsann* was fact-specific and is not helpful to plaintiff here because of the absence of evidence on the market and on the other market power issues. No trier of fact could assess the impact of anti-competitive pricing on a relevant market when that relevant market is undefined. And even if the relevant market were defined, without specific evidence indicating market shares

or entry or expansion barriers, no analysis of causal antitrust injury is appropriate.

Plaintiff must show not just an injury to itself as UPS's competitor. Rather, its burden is to show an injury to competition. There is no genuine issue of fact that competition has in fact increased, offering the benefits of the competition to customers. There is therefore no evidence showing a present or likely causal anti-trust injury.

## IX.

The court therefore concludes that plaintiff has not demonstrated a genuine issue of material fact on its causes of action based on monopoly or attempted monopoly. It has not carried its burden of showing a genuine issue on the relevant market. Nor has it presented sufficient evidence to show a genuine issue on defendant's market power in that relevant market. And it is has not shown anti-trust injury. Defendant's motion for summary judgment on plaintiff's Section Two claims must therefore be granted.

## X.

WPX's remaining claim alleges that UPS's shipping contracts ("CCAs"), are contracts that unreasonably restrain trade in violation of Section One of the Sherman Act, by requiring shippers to use UPS exclusively for their regional shipping needs. Specifically, WPX contends that these contracts contain terms that prevent customers from using other carriers. WPX also alleges that other contract terms prevent the customers from easily terminating the contracts, and require the customers to use UPS exclusively in order to secure promised discounts. Finally, WPX claims that UPS's use of these "exclusive dealing" contracts injures competition and causes WPX to suffer economic injury of the type the antitrust laws were designed to prevent.

UPS does not dispute the existence of CCAs with many of WPX's former customers. However, it disputes that the contracts are exclusive. The contracts (1) are terminable at will by either party on between 7 to 30 days notice; (2) do not require the customers to use UPS exclusively; and (3) do not base any discount to the customers upon the exclusive use of UPS.

To establish a claim under Section One, WPX must show that the CCAs unreasonably restrained trade under a rule of reason analysis. *See Bhan v. NME Hosp.,* 929 F.2d 1404, 1410 (9th Cir.1991) (citing *T.W. Elec. Serv. v. Pacific Elec. Contrs. Ass'n,* 809 F.2d 626, 632–33 (9th Cir. 1987)); *McDaniel v. Appraisal Inst.,* 117 F.3d 421, 422–23 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1305, 140 L.Ed.2d 470 (1998). To apply a rule of reason analysis the court must look for the actual effects of the CCAs on competition in the market. In order for the CCAs to be illegal restraints, WPX must show that the probable effect of the CCAs is to foreclose competition in a substantial portion of the market. *Cf. Omega Envtl., Inc. v. Gilbarco, Inc.,* 127 F.3d 1157, 1162 (9th Cir.1997). In addition, WPX must show that it suffered "antitrust injury"—i.e. an injury resulting from the anti-competitive effects of UPS's contracts. *Rebel Oil,* 51 F.3d at 1443–44.

The foreclosure effect of the CCAs is related to the issue of market share. *See Omega,* 127 F.3d at 1162–63. But as discussed above WPX has not shown a relevant market and has not delineated UPS's market share of any market.

Further, WPX has not provided adequate evidence that the CCAs are in fact exclusive. All of the contracts in evidence have termination clauses that allow either party to terminate for any reason as long as 7, 10, or 30 days notice, (depending on the specific contract) is given. Nearly all of the contracts have relatively short durations, ranging from 30 days to 3 years. (Only one contract, that with American Greetings, falls outside this range of duration. However, the American Greetings' CCA was entered into in 1993, prior to deregulation and UPS's entrance into the regional contract carrier market in the

west). Most important, none of the contracts contain terms requiring a customer to give all of its shipping business to UPS. The contracts often require the customer to maintain certain levels of volume in order to receive agreed pricing discounts. And some of the contracts state that the customer will make UPS the preferred carrier for the customer's regional shipping needs. But that is not a *requirement* that the customer can use only UPS.

The duration and termination terms of the CCAs do not support WPX's contentions that they are exclusive dealing contracts in violation of Section One. *Cf. Omega,* 127 F.3d at 1163–64. A competitor could obtain one of UPS's customers by offering better prices or services and having the customer provide UPS with the contractually stated notice. The termination provisions diminish the competitive advantage that such contracts create. *Id.* at 1164.

WPX's evidence on the exclusivity of the contracts is only the testimony of James Gordon, Traffic Manager at Henry Schein. Prior to 1995, when Schein entered into a CCA with UPS, it used WPX for its regional shipping needs. Mr. Gordon stated in his deposition that he never thought that UPS's CCA with Schein was exclusive. He always believed that he could terminate the contract at any time for any reason. Mr. Gordon never believed that all of Schein's business would have to go through UPS, and he indicated that Schein's commitment to ship 53,000 packages a week through UPS did not amount to that company's total weekly shipping volume.

Even if WPX could show exclusivity, the fact that other shippers have recently entered the market also indicates that competition exists and that the market is not foreclosed.

Even if the CCAs could be cast as unreasonable restraints, WPX cannot show that it has suffered antitrust injury. The failure to show antitrust injury, even with proof of an illegal restraint, is fatal to a Section One claim. *See McDaniel,* 117 F.3d at 423. Despite WPX's arguments, it has not been effectively eliminated from the market. Rather, it experienced a 60% increase in sales, generating over $100 million in revenues last year, the third year of UPS's alleged anti-competitive actions. WPX's claimed reduction of its higher profit margins does not equate to antitrust injury. *See id.* ("It is not enough for [the plaintiff] to show that a competitor, himself, was injured").

Plaintiff has not produced sufficient evidence to show that the contracts are exclusive dealing contracts, has not shown that the alleged restraints on the customers are unreasonable, and has not shown anti-trust injury. Plaintiff's evidence is insufficient to create a genuine issue of material fact on these issues. Summary judgment must therefore be granted to defendant on plaintiff's Section One claims.